WILBUR, SECRETARY OF THE INTERIOR, *v.*
UNITED STATES ᴇx ʀᴇʟ. KADRIE ᴇᴛ ᴀʟ.

No. 77.  Argued January 10, 13, 1930.—Decided April 14, 1930.

*Assistant Attorney General Richardson,* with whom *Messrs. E. C. Finney,* Solicitor, Department of the Interior, and *Pedro Capo-Rodriguez* were on the brief, for petitioner.

*Mr. Webster Ballinger* for respondents.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This is a petition for a writ of mandamus commanding the Secretary of the Interior to restore the relators to

the supplemental rolls of the Chippewa Indians in Minnesota and to pay to each of them a per capita share of all future distributions, whether of interest or principal, made from the fund created under section 7 of the act of January 14, 1889, c. 24, 25 Stat. 642.

The writ was denied by the Supreme Court of the District of Columbia, but that ruling was reversed by the Court of Appeals, 30 Fed. (2d) 989, and the matter is here for review on certiorari.

When the act of 1889 was passed the Chippewa Indians in Minnesota comprised eleven bands or tribes occupying ten distinct reservations in that State in virtue of treaties or executive orders. Collectively they were regarded as a single tribe and commonly called the Chippewas of Minnesota.[1] They numbered about 8,300 and their reservations contained approximately 4,700,000 acres. They were tribal Indians, under the guardianship of the United States, and held their reservations as tribal lands. The act of 1889 was directed to accomplishing their transition from the existing tribal relation and dependent wardship to full individual emancipation with its incident rights and responsibilities; and to that end

[1] These Indians formerly were part of the Chippewa or Ojibway Nation of the Great Lakes region. The Nation comprised many subordinate bands or tribes, some of which came to be permanently located in Canada and others in Michigan, Wisconsin, Minnesota and perhaps other States. The bands or tribes which came to be seated in Minnesota have latterly been designated as the Chippewas of Minnesota by way of distinguishing them from those seated elsewhere. Treaties, September 24, 1819, 7 Stat. 203; June 16, 1820, 7 Stat. 206; August 5, 1826, 7 Stat. 290; July 29, 1837, 7 Stat. 536; October 4, 1842, 7 Stat. 591; February 22, 1855, 10 Stat. 1165; March 11, 1863, 12 Stat. 1249; October 2, 1863, 13 Stat. 667; May 7, 1864, 13 Stat. 693; March 19, 1867, 16 Stat. 719; House Doc. Vol. 61, 59th Cong., 1st Sess. pp. 277–280; History of Ojibway Nation, Copway, pp. 170-171; Minn. His. Soc. Cols., Vol. 5, pp. 37-40, 507-509; also, Vol. IX, pp. 55-56.

the act made provision for obtaining, through a commission, a cession of all of their tribal lands save portions of the White Earth and Red Lake reservations needed for allotments; for using the unceded lands in making allotments in severalty, which were to be held subject to prescribed restrictions against alienation, encumbrance and taxation during a period of twenty-five years, or longer if the President so directed; and for selling the ceded lands and creating with the net proceeds an interest-bearing fund, which was to be held in the United States Treasury and expended for the benefit of the Indians as will appear later on.

The act required that the cession have the assent of two-thirds of the male adults and have the approval of the President; directed that the commission obtaining the cession make a census roll of each band or tribe as a guide in ascertaining whether the requisite number of Indians assented to the cession and in making contemplated allotments and payments; required, with exceptions not here material, that the Indians other than those on the Red Lake Reservation be removed to the White Earth Reservation, there to receive allotments; and directed that, after the completion of necessary preliminaries, allotments be made to all of the Indians as soon as practicable.

The contemplated cession was obtained from the Indians and was approved by the President March 4, 1890. The intended census rolls were made and transmitted to the Secretary of the Interior. Several provisions of the act have now been fully executed and others are still in process of administration. The fund created from the proceeds of the sale of the ceded lands is a large one; and the relators here are asserting a right to share in all future distributions therefrom.

The provisions governing the creation and use of that fund are embodied in section 7 of the act and are here

quoted at length—those which the parties emphasize being put in italics.

" Sec. 7. That all money accruing from the disposal of said lands in conformity with the provisions of this act shall, after deducting all the expenses of making the census, of obtaining the cession and relinquishment, of making the removal and allotments, and of completing the surveys and appraisals, in this act provided, be placed in the Treasury of the United States to the credit of all the Chippewa Indians in the State of Minnesota as a permanent fund, which shall draw interest at the rate of five per centum per annum, payable annually for the period of fifty years, after the allotments provided for in this act have been made, and which interest and permanent fund shall be expended for the benefit of said Indians in manner following: *One half of said interest shall, during the said period of fifty years, except in the cases hereinafter otherwise provided, be annually paid in cash in equal shares to the heads of families and guardians of orphan minors for their use; and one-fourth of said interest shall, during the same period and with the like exception, be annually paid in cash in equal shares per capita to all other classes of said Indians; and the remaining one-fourth of said interest shall, during the said period of fifty years, under the direction of the Secretary of the Interior, be devoted exclusively to the establishment and maintenance of a system of free schools among said Indians, in their midst and for their benefit; and at the expiration of the said fifty years, the said permanent fund shall be divided and paid to all of said Chippewa Indians and their issue then living, in cash, in equal shares: Provided,* that Congress may, in its discretion, from time to time, during the said period of fifty years, appropriate, for the purpose of promoting civilization and self-support among the said Indians, a portion of said principal sum, not exceeding five per centum thereof.

The United States shall, for the benefit of said Indians, advance to them as such interest as aforesaid the sum of ninety thousand dollars annually, counting from the time when the removal and allotments provided for in this act shall have been made, until such time as said permanent fund, exclusive of the deductions hereinbefore provided for, shall equal or exceed the sum of three million dollars, less any actual interest that may in the meantime accrue from accumulations of said permanent fund; *the payments of such interest to be made yearly in advance, and, in the discretion of the Secretary of the Interior, may, as to three-fourths thereof, during the first five years be expended in procuring livestock, teams, farming implements, and seed for such of the Indians to the extent of their shares as are fit and desire to engage in farming, but as to the rest, in cash;* and whenever said permanent fund shall exceed the sum of three million dollars the United States shall be fully reimbursed out of such excess, for all the advances of interest made as herein contemplated and other expenses hereunder."

In the negotiations resulting in the cession the commission construed the clauses providing for annual payments of one-half of the interest " in equal shares to the heads of families and guardians of orphan minors " and of one-fourth of the interest " in equal shares per capita to all other classes of said Indians " as meaning that three-fourths of the interest should be paid annually to the Indians in equal shares per capita; and the Secretary of the Interior, in laying the cession before the President for his approval, pronounced that construction reasonable and declared it should be adhered to. H. R. Ex. Doc. No. 247, 51st Cong., 1st Sess., pp. 5–6, 24. For several years payments under those clauses were made on that basis. Then the Secretary of the Treasury submitted to the Comptroller the question whether that basis of payment properly could be continued; and the

Comptroller, after observing that the clauses were obscurely worded, ruled that the construction given to them by the commission had become the true construction through its adoption in actual practice, and should be respected accordingly. 3 Comp. Dec. 158. All subsequent payments have been made, as the prior ones were, in accordance with that construction.

Manifestly some preliminary steps would need to be taken before the interest annuities could be rightly paid. The number of Indians entitled to participate would need to be ascertained so that the per capita share to be paid to each could be calculated; and those so entitled would need to be listed so that the paying tellers would know whom to pay. From the beginning these practical needs have been met by taking the commission's census rolls as a primary guide, eliminating the names of Indians dying after those rolls were made, making supplemental rolls of Indians erroneously omitted from the census rolls and of Indian children entitled to participate but born after the census was taken, and using the two sets of rolls—appropriately brought up to date and made to include only persons in being at the time—as a correct basis for the necessary calculation and listing.

This general statement will open the way for a better appreciation of the special facts and contentions in the present case.

Mary Blair, a full-blood Chippewa woman, was a member of the White Earth band in Minnesota and as such was included in the census rolls and given an allotment on the White Earth Reservation. Sarah Cogger, a daughter of Mary Blair, is of mixed Chippewa and white blood. She was born in 1892, after the census rolls were made, was enrolled on the supplemental rolls soon after her birth, and was recognized as a member of the White Earth band up to the time of her marriage. In 1909 she was married to Mall Kadrie, a Syrian by birth but a

naturalized citizen of the United States. After her marriage she abandoned her tribal relations and ever since has resided with her husband among white people—for several years in Canada and Syria and during the later years at International Falls and St. Paul in Minnesota. She was paid a per capita share in all interest annuities distributed after her enrollment and before her abandonment of the tribal relations, and has received a like share in all subsequent annuities—these later payments to her being in accord with the statutes which save to such an Indian her personal right to share in annuities, tribal funds, etc., as though her tribal relations were main-tained.[2]

The nine relators are minor children of Sarah and Mall Kadrie and were born—the first four in Canada and the others at International Falls and St. Paul in Minnesota—after their mother had abandoned her tribal relations and was permanently residing with her husband among white people. So, while all of the relators have a minor fraction of Minnesota Chippewa blood, they were born of parents having no tribal relations then or since and have lived only in white communities.

At their mother's request, following their respective births, the first three of these children were placed on the supplemental rolls and shared in some of the interest annuities. A like request on behalf of the fourth child led to an inquiry which brought attention to the mother's marriage to a white man, her abandonment of the tribal relations and the birth of the four children in Canada where the parents were then residing. With these facts before it the Indian Bureau, in 1916, declined to enroll the fourth child and cancelled the prior enrollment of the first three. Paragraph 4 of section 324 of the Regulations of the Indian Bureau, as amended April 1, 1905, was

[2]Acts March 3, 1875, c. 131, § 15, 18 Stat. 420; February 8, 1887, c. 119, § 6, 24 Stat. 390; August 9, 1888, c. 818, § 2, 25 Stat. 392.

cited as the applicable administrative rule in such matters. That paragraph reads:

"All children born to annuitants either before or since the last preceding payment, who have not already been enrolled, should be enrolled with their parents. This includes cases where the mother is an Indian woman married to a white man, and such woman and her issue are recognized by the tribe as belonging thereto, and where the family so founded identifies itself and affiliates with the tribe of which the mother is a recognized member. When an Indian woman by her marriage with a white man has, in effect, withdrawn from the tribe and is no longer identified with the tribal community and interests, the offspring of such a marriage are not entitled to share in annuities or other benefits as Indians and must not be enrolled."

In 1919 the Secretary of the Interior, following an opinion given by the Solicitor for that Department, ruled that Mrs. Kadrie's children were entitled to share in the interest annuities. The children born up to that time were then placed on the supplemental rolls, and those born thereafter were enrolled soon after birth. All then shared for a time in the annuities. In 1927 a succeeding Secretary of the Interior, adopting and applying an opinion given by a succeeding Solicitor, held that these children were not entitled to share in the interest annuities, and accordingly directed that their enrollment be cancelled and no further payment be made to them.

The two solicitors differed sharply. The first was of opinion that the act of 1889 should be construed and given effect as if it were a conventional deed of trust; and with this as a premise he concluded that the fund established under section 7 is not a tribal fund but one held for designated Indian beneficiaries as individuals, and that the beneficiaries comprise, first, all Indians now living who were included in the census rolls as members

of the tribe, and, secondly, all living lineal descendants of any Indian so enrolled, regardless of whether the descendant is or ever was a member and even though he was born of parents neither of whom was a member at the time. And as the Kadrie children are lineal descendants (grandchildren) of Mary Blair, who was included in the census rolls as a member, that Solicitor regarded them as entitled to share in the distributions.[3] The second Solicitor was of opinion that the act is to be construed and given effect as an exertion by Congress of its authority over the affairs and property of tribal Indians under the guardianship of the United States; that the fund established under section 7 is a tribal fund derived from the sale of tribal lands, and is held and being administered as such by the United States; that the tribe has not been dissolved but is recognized by Congress as still existing; that in this situation the right to share in the interest annuities depends upon existing tribal membership, save in exceptional instances where Congress has provided otherwise; and that the Kadrie children, all of whom were born of a white father and after their mother had separated from the tribe and was permanently living among white people, are without tribal

[3] The Solicitor said:

" The ancestor must be found to have been of the tribal membership at the time of the creation of the trust. . . . His descendants (whether children or grandchildren) take an interest, not as tribal members, but as of the ancestor's blood; his blood entitling him and them alike, because it was tribal blood." ·

Also:

" Sarah Kadrie and her children are ' issue ' of her mother, a full-blood Chippewa Indian duly enrolled, and as such they will be entitled, at the expiration of the trust period, to share in the distribution of the trust fund; and meanwhile they are equally entitled to share in the annuities arising from that fund. Those rights they have not forfeited either by acquiring foreign citizenship or by abandoning, or failing to acquire, residence on the Indian reservation or with the tribe."

membership and not within any exceptional provision permitting other than existing members to share in such annuities. This Solicitor rested his opinion in part upon the general rule that, in the absence of provision to the contrary, the right of individual Indians to share in tribal property, whether lands or funds, depends upon tribal membership, is terminated when the membership is ended, and is neither alienable nor descendible.[4]

In the present petition the relators assert that the decision of the Secretary of the Interior in 1927, although given after notice and hearing, is void in that the then Secretary was without power to reconsider and revoke the decision of his predecessor in 1919 on the same matter; and they further assert that the decision in 1927 is otherwise wrong in that it rests upon untenable rulings to the effect that the fund established under section 7 is a tribal fund and is held and being administered as such by the United States, that the tribe has not been dissolved, and that the right to share in the annuities from the fund is confined to members of the tribe, save in exceptional instances which do not include the relators. Upon these grounds the relators seek a writ of mandamus directing, in substance, that the Secretary of the Interior put aside the decision of 1927 and restore and give effect to that of 1919.

If at the time of the decision in 1927 the Secretary of the Interior was without power to reconsider and revoke the decision of 1919, it well may be that the relators would be entitled to the relief by mandamus which they seek.[5] But there was no such want of power. The de-

[4] *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294, 307; *Gritts* v. *Fisher,* 224 U. S. 640, 642; *Sizemore* v. *Brady,* 235 U. S. 441, 446; *La Roque* v. *United States,* 239 U. S. 62, 66; *Oakes* v. *United States,* 172 Fed. 304, 307.

[5] *United States* v. *Schurz,* 102 U. S. 378, 402–403; *Noble* v. *Union River Logging R. R.,* 147 U. S. 167, 171; *Garfield* v. *Goldsby,* 211 U. S. 249, 261–262.

cision in 1919 was, not a judgment pronounced in a judicial proceeding, but a ruling made by an executive officer in the exertion of administrative authority. That authority was neither exhausted nor terminated by its exertion on that occasion, but was in its nature continuing. Under it the Secretary who made the decision could reconsider the matter and revoke the decision if found wrong; and so of his successor. The latter was charged, no less than the former had been, with the duty of supervising the payment of the interest annuities and of causing them to be distributed among those entitled to them and no others; and if he found that individuals not so entitled were sharing in the annuities by reason of a mistaken or erroneous ruling of the former his authority to revoke that ruling and stop further payments under it was the same as if it had been his own act.[6] The powers and duties of such an office are impersonal and unaffected by a change in the person holding it.

The case of *United States* v. *Atkins*, 260 U. S. 220, relied on by the relators, is not in point. It involved an enrollment by a special commission under a statute providing that the enrollment when approved by the Secretary of the Interior should be "final" and entitle the person enrolled to an allotment. The Secretary approved and in usual course an allotment was made and a patent issued. Thereafter the enrollment was drawn in question in a suit brought to cancel the patent. This Court held that the statute was intended to make the enrollment when approved by the Secretary conclusive of the individual's existence, membership, etc., and unimpeach-

---

[6] *West* v. *Standard Oil Co.*, 278 U. S. 200, 210; *Beley* v. *Naphtaly*, 169 U. S. 353, 364; *Knight* v. *U. S. Sand Association*, 142 U. S. 161, 181–182; *New Orleans* v. *Paine*, 147 U. S. 261, 266; *Greenameyer* v. *Coate*, 212 U. S. 434, 442; *Parcher* v. *Gillen*, 26 L. D. 34, 43; *Aspen Consolidated Mining Co.* v. *Williams*, 27 L. D. 1, 10–11. And see *Pearsons* v. *Williams*, 202 U. S. 281, 284–285.

able except for such fraud or mistake as would afford ground for avoiding a judgment in adversary proceedings. There is no like provision in the act of 1889. Nor does it contain any mention of supplemental rolls. They are administrative devices intended to safeguard and facilitate the distribution of the annuities. No doubt they are intended to be evidential of the right to share therein, but there is no basis for holding them conclusive or not subject to revision.

As the decision of the Secretary in 1927 was made in the exercise of lawful authority, it becomes necessary to examine the complaint that the decision on the merits is wrong. In doing so there is need for having in mind the limited scope of the remedy here invoked.

Mandamus is employed to compel the performance, when refused, of a ministerial duty, this being its chief use. It also is employed to compel action, when refused, in matters involving judgment and discretion, but not to direct the exercise of judgment or discretion in a particular way nor to direct the retraction or reversal of action already taken in the exercise of either.[7]

The duties of executive officers, such as the Secretary of the Interior, usually are connected with the administration of statutes which must be read and in a sense construed to ascertain what is required. But it does not follow that these administrative duties all involve judgment or discretion of the character intended by the rule just stated. Where the duty in a particular situation is so plainly prescribed as to be free from doubt and equivalent to a positive command it is regarded as being so

---

[7] *Commissioner of Patents* v. *Whiteley*, 4 Wall. 522, 534; *United States ex rel.* v. *Black*, 128 U. S. 40, 48; *Riverside Oil Co.* v. *Hitchcock*, 190 U. S. 316, 324-325; *Louisiana* v. *McAdoo*, 234 U. S. 627, 633; *Interstate Commerce Commission* v. *Waste Merchants Ass'n*, 260 U. S. 32, 34.

far ministerial that its performance may be compelled by mandamus, unless there be provision or implication to the contrary.[8] But where the duty is not thus plainly prescribed but depends upon a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus.[9]

A reference to three of the cases just cited will serve to illustrate the application of this doctrine in instances where mandamus is sought for the purpose of controlling a Secretary in the discharge of duties of the latter class. In *Riverside Oil Co.* v. *Hitchcock* mandamus was sought as a means of compelling the Secretary of the Interior to retract a decision theretofore given and to make another along different lines. This Court, after pointing out that the Secretary's duty in the matter was not formal or ministerial, said: " The court has no general supervisory power over the officers of the Land Department, by which to control their decisions upon questions within their jurisdiction. If this writ were granted we would require the Secretary of the Interior to repudiate and disaffirm a decision which he regarded it his duty to make in the exercise of that judgment which is reposed in him by law, and we should require him to come to a determination upon the issues involved directly opposite to that which he had reached, and which the law conferred

---

[8] *Roberts* v. *United States*, 176 U. S. 221, 231; *Lane* v. *Hoglund*, 244 U. S. 174, 181; *Work* v. *McAlester-Edwards Co.*, 262 U. S. 200, 208; *Work* v. *Lynn*, 266 U. S. 161, 168, *et seq.; Wilbur* v. *Krushnic*, 280 U. S. 306.

[9] *Riverside Oil Co.* v. *Hitchcock*, 190 U. S. 316, 324–325; *Ness* v. *Fisher*, 223 U. S. 683, 691; *Knight* v. *Lane*, 228 U. S. 6, 13; *Lane* v. *Mickadiet*, 241 U. S. 201, 208, 209; *Alaska Smokeless Coal Co.* v. *Lane*, 250 U. S. 549, 555; *Hull* v. *Payne*, 254 U. S. 343, 347; *Work* v. *Rives*, 267 U. S. 175, 183–184. And see *United States ex rel.* v. *Hitchcock*, 205 U, S, 80, 86,

upon him the jurisdiction to make. Mandamus has never been regarded as the proper writ to control the judgment and discretion of an officer as to the decision of a matter which the law gave him the power and imposed upon him the duty to decide for himself. The writ never can be used as a substitute for a writ of error. Nor does the fact that no writ of error will lie in such a case as this, by which to review the judgment of the Secretary, furnish any foundation for the claim that mandamus may therefore be awarded." In *Knight* v. *Lane*, where a proposed adjustment of a controversy between Indians over an allotment had been approved by the Secretary in one decision and afterwards disapproved in another, it was said: "Inasmuch as the decision of the Secretary revoking his prior approval of the proposed adjustment was not arbitrary or capricious, but was given after a hearing and in the exercise of a judgment and discretion confided to him by law, it cannot be reviewed, or he be compelled to retract it, by mandamus." And in *Lane* v. *Mickadiet* mandamus was sought as a means of preventing the Secretary from reconsidering, after notice and hearing, a prior decision determining who were the heirs of a deceased Indian and sustaining the Indian's adoption of a child not related to him. The mandamus was refused on the ground that the Secretary's judgment and discretion in determining such heirships could not be thus controlled; and in disposing of an argument similar to one which is advanced here the court said: "But it is said that the purpose of the statute was to give the recognized heir a status which would entitle him to enjoy the allotted land and not to leave all his rights of enjoyment open to changing decisions which might be made during the long period of the trust term and thus virtually destroy the right of property in favor of the heir which it was the obvious purpose of the statute to protect. But

in last analysis this is a mere argument seeking to destroy a lawful power by the suggestion of a possible abuse."

It is apparent that, with the question of the Secretary's authority resolved against the relators, the only question open in this proceeding is whether the decision of 1927 was given in the discharge of a ministerial duty controllable by mandamus or of a duty requiring the exercise of judgment or discretion not thus controllable.

The questions mooted before the Secretary and decided by him were whether the fund is a tribal fund, whether the tribe is still existing and whether the distribution of the annuities is to be confined to members of the tribe, with exceptions not including the relators. These are all questions of law the solution of which requires a construction of the act of 1889 and other related acts. A reading of these acts shows that they fall short of plainly requiring that any of the questions be answered in the negative and that in some aspects they give color to the affirmative answers of the Secretary. That the construction of the acts insofar as they have a bearing on the first and third questions is sufficiently uncertain to involve the exercise of judgment and discretion is rather plain. The second question is more easily answered, for not only does the act of 1889 show very plainly that the purpose was to accomplish a gradual rather than an immediate transition from the tribal relation and dependent wardship to full emancipation and individual responsibility, but Congress in many later acts—some near the time of the decision in question—has recognized the continued existence of the tribe.[10] This recognition was respected by the Secretary

---

[10]Acts of August 1, 1914, c. 222, 38 Stat. 592; May 18, 1916, c. 125, 39 Stat. 135; March 2, 1917, c. 146, 39 Stat. 979; May 25, 1918, c. 86, 40 Stat. 572; June 30, 1919, c. 4, 41 Stat. 14; February 14, 1920, c. 75, 41 Stat. 419; November 19, 1921, c. 135, 42 Stat. 221; January 30, 1925, c. 114, 43 Stat. 798; February 19, 1926, c. 22, 44 Stat., P. 2, 7; March 4, 1929, c. 705, 45 Stat. 1584.

and is not open to question here.[11]  With the tribe still existing the criticism by counsel for the relators of the Secretary's decision in other particulars loses much of its force.

The time fixed for the final distribution is as yet so remote that no one is now in a position to ask special relief or direction respecting that distribution.

From what has been said it follows that the case is not one in which mandamus will lie.

*Judgment of Court of Appeals reversed.*
*Judgment of Supreme Court affirmed.*

---

[11] *United States* v. *Holiday,* 3 Wall. 407, 419; *United States* v. *Rickert,* 188 U. S. 432, 445; *Tiger* v. *Western Investment Co.,* 221 U. S. 286, 315.