UNITED STATES ex rel. CHICAGO GREAT WESTERN R. CO. et al. v. INTERSTATE COMMERCE COMMISSION et al.

No. 6068.

Court of Appeals of the District of Columbia.
Argued April 5, 1934.

Decided May 7, 1934.

A. F. Smith, of Kansas City, Mo., F. H. Towner, of Chicago, Ill., and George E. Hamilton, John J. Hamilton, George E. Hamilton, Jr., and Henry R. Gower, all of Washington, D. C., for appellants.

Daniel W. Knowlton, H. L. Underwood, and E. M. Reidy, all of Washington, D. C., for appellee Interstate Commerce Commission.

E. A. Boyd, of Chicago, Ill., and Lawrence H. Cake, of Washington, D. C., for appellees Atchison, Topeka & Santa Fé Ry. Co. and others.

Samuel W. Sawyer, of Kansas City, Mo., and Lawrence H. Cake, of Washington, D. C., for appellee Kansas City Terminal Ry. Co.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

This is an appeal from a judgment denying a petition for mandamus. The history of the controversy goes back more than a quarter of a century. Boiled down it is this: In 1906, a Missouri corporation was organized for the purpose of acquiring, constructing, and operating a union station and terminal facilities in Kansas City, Missouri-Kansas. Ten railroad companies operating lines of railroad entering into or passing through Kansas City agreed to use the facilities of the terminal company. An operating agreement was entered into in 1909, and the next year appellants, Chicago Great Western Railroad Company and the Kansas City Southern Railway Company, who were not among the original ten, became parties to the agreement to the same extent and in the same manner as the others. The terminal company acquired lands and rights of way necessary to the accomplishment of the enterprise, and, some time after the agreement, the terminal was completed. The contract provided for equal ownership, equal control, and equal privileges in the use of the property as between the signatory companies. Each of the twelve railroads paid for $183,333.33 of stock in the terminal company, which was all of the stock issued. The agreements provided for the admission of other railroads in the use of the properties and facilities, each of the companies having an equal voice and vote in the matter of the admittance of other railroads. The terminal company issued and sold $50,-

000,000 of bonds secured by mortgage or deed of trust on the property, each of the roads agreeing to pay an equal proportion of taxes and of interest on bonds. The stock of the terminal company owned by each of the railroad companies was deposited with a trustee. It was agreed that, if any owning company should default in the payment of its share of the taxes, or principal or interest, such defaulted sum should be paid by the nondefaulting companies in equal parts. All other expenses, such, for instance, as maintenance, transportation expenses, and salaries and wages, were to be paid by the owning companies on a user basis. One of the parties to the agreement was the Missouri, Kansas & Texas Railway Company. In 1915 it was placed in the hands of receivers. The receivership was followed by a decree of foreclosure entered by the federal court for the Eastern district of Missouri. The decree (of sale) provided that the purchaser might, within a year from the date of the delivery of deeds and taking possession of the property, elect to adopt or reject any executory contract to which the old company was a party. The purchaser organized a corporation under the name of Missouri-Kansas-Texas Railroad Company to take over and operate the property purchased, and this company duly filed its election not to adopt the agreement of its predecessor company with relation to the terminal property, and then, being without terminal facilities in Kansas City, petitioned the Interstate Commerce Commission for an order pursuant to the provisions of paragraph 4 of section 3 of the Interstate Commerce Act (49 USCA § 3 (4) to accord it the right to use a designated portion of the terminal on an equitable basis, i. e., a basis on which compensation would be figured on the extent of the use. The Commission issued a temporary order effective April 1, 1924, permitting the new company for the time being to use the terminals upon the terms and provisions of the operating agreement and for the compensation therein provided, reserving for future determination the final measure of compensation for use during the period the service order should be in effect. The Commission gave the petition its docket number 15682. The eleven other railroad companies filed intervening petitions before the Commission and participated in the proceedings. Some of the interveners, including appellants, sought to obtain the same relief as to terms that was sought by the petitioner (Missouri-Kansas-Texas Railroad Company). In due time the Commission heard and considered the petition. At the time of rendering its decision (1925) a suit was pending in the federal court in Missouri, the object of which was to have the court decree the Missouri-Kansas-Texas Railroad Company (the petitioner) bound by the terminal operating agreement entered into by its predecessor company, and the decision of the Commission noted the pendency of this proceeding and held that, if the new company should be adjudged to be bound by the operating agreement, the relief prayed for could not be granted, and, if adjudged not to be bound, a subsequent order would be entered in accordance with the provisions of the act, but the Commission construed the act and held as to interveners (appellants) that the provisions relied upon were not sufficiently broad to authorize the Commission to grant the relief asked and dismissed the interventions.

After the Commission had filed its report (November 10, 1925) just above referred to, nothing more was done until 1931. In that year Missouri-Kansas-Texas Railroad (having in the meantime been successful in sustaining in the court proceeding its right to reject the contract of its predecessor company as to the terminal property), and these appellants each separately filed petitions with the Commission, the former to have determined the amount of compensation which it should pay under the provisions of section 3 (4) of the act for the use of the terminal facilities and the latter for a rehearing upon the order dismissing the intervening petitions. The Commission about the middle of 1931 denied a rehearing to interveners (appellants), and in 1933 this proceeding was begun by petition for a writ of mandamus to compel the Commission to set aside its order of November 10, 1925 (and also its order of June 1, 1931, denying interveners a rehearing). The Commission answered the petition and appellants filed a demurrer to the Commission's answer. The court below overruled the demurrer, and appellants, electing to stand thereon, entered an order denying mandamus but allowing an appeal to this court.

We have, therefore, here a case in which twelve railroad companies operating to and through Kansas City enter into an agreement for the construction of joint freight and passenger terminal facilities with the right to all to use the same on equal terms for a period of 200 years. Each of the companies subscribed to and paid for one-twelfth of the total capital stock of the terminal company. After the terminal was completed, that company operated in excess of 172 miles of track

and reached 208 industries with its rails, and performed switching services for the user lines and for the industries. The cost of the terminal was ascertained at the time of completion to be in the neighborhood of $50,000,000. The interest on this amount and the taxes on the property the agreement divided equally among the twelve users and stock-holders; that is to say, each company paid one-twelfth of the aggregate of the items, interest and taxes, and assumed an equal and ratable liability for the payment of the principal. For this each railroad was entitled to equal operating rights for both its freight and passenger trains. The other charges in connection with the operation of the terminals, such as maintenance and operating expenses, were to be accounted for and assessed against each line in the proportion which its use of the facilities and tracks bore to the total use by it and the other lines. Detailed provisions were made with relation to the apportionment of these expenses, and no point is made that these were not fair and reasonable. The single point at issue involves the provisions of the agreement requiring each of the railroads to pay one-twelfth of the taxes and one-twelfth of the interest accruing on the terminal company's bonds. Appellants and some of the smaller railroads, which, like themselves, use the terminal facilities, trackage, etc., far less extensively than some of the larger roads, consider the provision referred to inequitable and burdensome and insist upon a division. of all charges upon a user basis. On the other hand, the larger railroads, while admittedly using the facilities to a greater extent, oppose any change in the contract basis. They tell us the Commission has no power to set aside the provisions of the contract, and they also say that, even if it has, the enforcement of the power would have calamitous consequences, not only to the terminal in question, but to other projects of a like kind. They point out that the operating agreement has been assigned as additional security for the bonds, and that it was the agreement of all the lines to be equally bound that made the bonds attractive and induced investment in them, and, finally, that. it is not the province or the duty of the Commission to save appellants from their own improvidence.

With this view of the situation, we turn to the sections of the Interstate Commerce Act which appellants invoke as authorizing and requiring the Commission to do the things they ask. They are paragraphs 1 and 3 of section 3 of the Interstate Commerce Act, and paragraph 4 which was added to section 3 by the Transportation Act of 1920 (49 USCA § 3 (1) (3) (4), as follows:

"(1) It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"(3) All carriers, engaged in the transportation of passengers or property, subject to the provisions of this chapter, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers or property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares, and charges between such connecting lines, or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper.

"(4) If the commission finds it to be in the public interest and to be practicable, without substantially impairing the ability of a carrier owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power to require the use of any such terminal facilities, including main line track or tracks for a reasonable distance outside of such terminal, of any carrier, by another carrier or other carriers, on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensation in condemnation proceedings. Such compensation shall be paid or adequately secured before the enjoyment of the use may be commenced. If under this paragraph the use of such terminal facilities of any carrier is required to be given to another carrier or other carriers, and the carrier whose terminal facilities are required to be so used is not satisfied with the terms fixed for such use, or if the amount of compensation so fixed is not duly and promptly paid, the carrier whose terminal facilities have thus been required to be given to another carrier or other carriers shall be entitled to recover, by suit or action against such other

carrier or carriers, proper damages for any injuries sustained by it as the result of compliance with such requirement, or just compensation for such use, or both, as the case may be."

In respect to appellants' argument as to the applicability of paragraphs 1 and 3, the Commission says in its report:

"Paragraph (1) prohibits any undue prejudice or preference as between particular persons, companies, firms, corporations, or localities, or particular descriptions of traffic, in any respect whatsoever, chargeable to any common carrier or carriers subject to the act. Paragraph (3) commands the maintenance of appropriate facilities for the interchange of traffic between carriers, and for the receipt, forwarding, and delivery of passengers and property, without discriminations in rates, fares, and charges or in the distribution of unrouted traffic between their connections. Assuming, without now deciding, that the provisions of paragraph (1) are broad enough to embrace, as between the parties thereto, a joint terminal agreement into which all the lines have voluntarily entered and for which they are mutually responsible, the distribution of the charges here in question is not shown to fall within their condemnation. Those charges are distinctly capital charges, based upon the terminal property itself, not upon its use, in no sense assumed by or chargeable to the proprietary lines as compensation for uses they either do or may make, and are divided among the lines in the proportions of their equitable titles to or interests in the property. For their respective uses of the property the lines severally assume maintenance and operating expenses in corresponding proportions. This is not shown to be undue prejudice or preference or unjust discrimination. Each proprietary pays an equal share of the aggregate interest and taxes upon its equal share in the aggregate property. Also, as essentially capital charges, they have no relation, direct or indirect, to the interchange of traffic between the several lines within the contemplation of paragraph (3)."

And as to paragraph (4) the Commission says:

"The paragraph above quoted [section 3 (4)] empowers us, when found to be in the public interest and practicable, without impairing the ability of a carrier 'owning or entitled to the enjoyment of terminal facilities' to handle its own business, to require the use of the facilities by 'another carrier' or 'other carriers' upon terms and for compensation to be agreed upon or to be fixed as provided. The primary power to be exercised is to 'require the use' of the terminals, which power the further power to fix the compensation in appropriate circumstances merely supplements. The requirement is to be laid upon a carrier then 'owning or entitled to the enjoyment' of the facilities and for the benefit of 'another carrier' or 'other carriers'; in other words, to be laid upon a carrier owning or by lease or otherwise entitled to present enjoyment and for the benefit of a carrier or carriers not so owning or entitled.

"Obviously, the interveners are not in the latter situation. They have been and are in all respects entitled to the past, present, and future enjoyment of the terminals in question, and have enjoyed and now enjoy them in their own right as virtual coproprietors. They and the other proprietary lines have the equitable title to the property and franchises in undivided equal shares, and through their corporate instrument, the respondent, the facilities are controlled and operated. Not only so, those interveners, equally with the other proprietaries, have been and still are parties to the operating agreement, and to accord them the desired relief would necessarily involve to that extent what would amount to a revision or reformation of that agreement. * * * Manifestly, the charges could be revised only by a virtual revision, through a superseding order, of those provisions of the agreement in accordance with which the charges are imposed. The power and authority thus invoked are not conferred by the quoted paragraph."

These two quotations from the lengthy report of the Commission, which in the interest of clarity we think it proper to set out as fully as we do, sufficiently explain the ground on which the Commission based its refusal to grant the relief asked. The Commission, no less than ourselves, was impressed with the hardship inherent in the case, for in its report it says: "This case strongly suggests the advisability of a reexamination by the respective participating carriers of terminal arrangements which have been developed through the past decades, including division of capital charges and adjustment of property interests. The subject is obviously of such importance to the public, including the railroads, that a reappraisal should be voluntarily undertaken in the light of present conditions." This suggestion of the Commission that the roads voluntarily amend the contract was obviously the result of the conclusion, inevitable in the circumstances, that

the smaller railroads had made an unwise and oppressive agreement which in the light of subsequent events seriously impaired their ability to operate their properties on a satisfactory basis, and there can be no reasonable doubt either of the fact or the result. Appellants' use of the terminals now and for some years has averaged less than 3 per cent. of the total use, whereas their contribution to the payment of interest and taxes is 8⅓ per cent. In dollars and cents each of the twelve railroads paid in the year 1932 on account of interest and taxes approximately $200,000. Had these charges been divided on a user basis, some of the larger roads would have paid approximately $600,000 and appellants only a little more than $50,000. This is so because some of the smaller roads use the terminals for a single passenger train a day, whereas some of the larger roads operate from fifteen to twenty. No further illustrations are needed to show that the contract according to its terms imposes on the smaller lines payments altogether in excess of benefits received, and we have no reason to doubt that, if the contract were now in the making, the user basis as applied both to fixed charges and operating expenses would be considered the only fair and reasonable method to adopt.

 The Commission, we think, share this view, and it is clear would have revised the contract accordingly if they could have interpreted the statutes broadly enough to justify such action. But appellants tell us that the statute is broad enough and that, in the view they are entitled to take, the refusal of the Commission to grant the relief is not grounded on a misinterpretation of the statute, but is in every respect a denial of jurisdiction. In support of this they quote from the opinion certain statements to the effect that "the power and authority thus invoked are not conferred by the quoted paragraph [the statute]," and again, "we are unable to find the requisite power or authority in any other provision of the act," and "we are unable to spell out from that provision such a jurisdiction." These statements they say indicate the view of the Commission that it was without jurisdiction. But we think the appellants' position in this respect is grounded upon a mistaken theory. It is not a lack of jurisdiction to hear and decide that the Commission refers to but a lack of legislative authority to do the particular thing appellants ask. The Commission is an administrative body and can exercise only the powers delegated to it by Congress, but in the application and interpretation of the powers conferred it exercises judgment and discretion, and it was clearly in the exercise of these that it used the language in the quoted sentences above. If the Commission has the power in this instance to change the contract, it got it only by statute, and it was by looking to the statute and its limitations that the Commission reached its negative conclusion. And we may remark in passing that, to justify the Commission in the exercise of such authority as is asked, the right to do so should be expressed in clear and certain language. Congress has conferred on the Commission broad powers for the purpose of avoiding discriminations, preferences, and inequalities, and has likewise given it power to regulate the interchange of traffic and the distribution of cars, to revise extortionate exactions under trackage agreements, to enforce the use by one carrier of the terminal facilities of another, and indeed to take all necessary steps to maintain an adequate railway service, but it is going too far to say that all or any of these powers of themselves justify the abrogation or annulment of a valid contract between carriers in the use of terminal facilities because in its subsequent carrying out inequalities are shown to exist. The case is, of course, different if the contract either then or subsequently violates a specific law of the United States. Cf. Louisville & N. R. R. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671. In cases in which it does not, it may well be that only the most pressing public necessity would justify the Congress in delegating to an administrative body jurisdiction to destroy a valid contract and substitute another of its own making, and the Commission would not be justified in assuming Congress had done so except when the authority was clear, for the inviolability of contracts is a cardinal principle of our business and social life. The states are forbidden to pass any law impairing them, and as far back as the ordinances for the government of the Northwest Territory it was stated as a primary principle that, in the just preservation of rights and property, it is understood and declared that no law ought ever to be made, or have force, that shall in any manner whatever interfere with or affect private contracts or engagements bona fide, without fraud, previously made. This is no more than the recognition of a fundamental principle, as true now as then, that contracts, as vesting rights of property, ought to be protected from interfering legislation.

In the petition which appellants filed with the Commission they ask for an investigation of the terminal situation, and that the Commission thereafter provide for the use of the terminal by all the railroads on a fair and equitable basis. They support the petition by reference to a statute which on the one hand makes it unlawful for a common carrier to give any undue or unreasonable preference to any person, firm, or corporation, and, on the other, authorizes the Commission to require a railroad company to divide its terminal facilities with another. They insist that the provisions are broad enough to require the Commission to modify the terms of the contract and provide a use of the terminals on a different basis of compensation, because, as they claim, the contract they had made for themselves imposed in its operations burdens which in the public interest they should not be required to discharge, and they rely upon Louisville & N. R. R. v. Mottley, supra, to sustain their position.

But, even if we should think the statute may be so construed, it does not follow that this court or any other court can require the Commission to decide the question in that way when it has considered the matter and announced that its own judgment is opposed to that interpretation. In that case its interpretation, right or wrong, is the exercise of judgment and discretion—impregnable to mandamus. If what the Commission had done was to refuse to hear the case made by petitioner, or, having heard it, refuse to carry out the plain mandate of the statute, as was the case in Roberts v. U. S., 176 U. S. 221, 20 S. Ct. 376, 44 L. Ed. 443, mandamus would be the proper remedy, but that is not this case, for the Commission did not refuse to hear and to decide; it did both, and an examination of the provisions relied on clearly may not be said by any one, when considered in the light of appellants' claims, to disclose a positive command. Wilbur v. U. S., 281 U. S. 206, 218, 219, 50 S. Ct. 320, 74 L. Ed. 809. The mistake appellants make is that they construe the refusal of the Commission to find in the act authority to do the thing appellants pray may be done, as denial of jurisdiction, whereas the fact is the Commission assumed jurisdiction, heard the evidence, and reached the conclusion that on the facts shown no relief could be given under the provisions of the applicable laws. That this was the construction of a statute is obvious; that the statute from appellants' point of view is not free from doubt is equally obvious; and that action in such circumstances cannot be controlled by mandamus is settled law.

In this view, it follows, without regard to what we may think of the equities, or even whether we would have construed the statute differently, we are without jurisdiction in this proceeding to change the result. The action of the Commission was judicial, and, as the Supreme Court said very recently in a case from us, "errors of law in the discharge of a function essentially judicial are not subject to be corrected through the writ of mandamus any more than errors of fact." Interstate Commerce Commission v. U. S., 289 U. S. 385, 393, 53 S. Ct. 607, 611, 77 L. Ed. 1273.

The judgment of the Supreme Court of the District is affirmed.

Affirmed.

HITZ, Associate Justice (concurring).

I concur in the judgment of the court in this case, but not in all the far-reaching statements and implications of the opinion.

It seems to me clear that the Interstate Commerce Commission took jurisdiction of the questions presented; considered them at length; and decided them by a much divided vote, from which decision so reached no writ of mandamus lies to require a contrary decision.

But the opinion of the court asserts that the contract seriously impairs the ability of the smaller roads to operate their properties satisfactorily, and I feel constrained to dissent from the view—though based on the ordinance for the Northwest Territory and the other authorities cited—that a common carrier subject to the provisions of these statutes may contract itself out of the power of the Commission by an arrangement involving so much of its revenue and covering so long a time as to impair or destroy its power to perform its public obligations.