## 13TH REGIONAL CORPORATION and Al-Ind-Esk-A, Inc., Appellants,

v.

## U.S. DEPARTMENT OF INTERIOR.

### No. 79–2140.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 22, 1980.

Decided Nov. 20, 1980.

William R. Meyer, Washington, D. C., for appellants.

Gail Osherenko, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., Charles H. Ruff, U. S. Atty., Walter J. Postula, Sp. Asst. U. S. Atty., Steven A. Herman, Atty., Dept. of Justice, and Edward J. Shawaker, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Before BAZELON, Senior Circuit Judge, and WALD and EDWARDS, Circuit Judges.

WALD, Circuit Judge.

Appellants 13th Regional Corporation and Al-Ind-Esk-A, Inc. sued the Department of Interior ("DOI") to obtain a writ of mandamus[1] ordering the Department to perform certain duties allegedly owed to them under section 2(c) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601(c). The trial court dismissed the suit, holding that relief in mandamus was unavailable because the appellants failed to show that the Secretary of DOI had "a clearly defined obligation which does not involve the exercise of administrative discretion." Joint Appendix (J.A.) at 14. We affirm the dismissal, though for reasons other than those relied on by the district court.

*The Facts*

The 13th Regional Corporation is a corporate body created in 1975 pursuant to the terms of the Alaska Native Claims Settlement Act ("ANCSA" or "Act"), 43 U.S.C. §§ 1601–24. Its shareholders are Alaska "Natives" (as defined by the Act) residing outside the state of Alaska. The second plaintiff, Al-Ind-Esk-A, Inc., is an Alaskan corporation which operates programs and activities for the benefit of Alaska Natives residing outside the state of Alaska.

ANCSA was passed in 1971 to effectuate a comprehensive settlement of all native claims based on aboriginal use and occupancy of land in Alaska. 1971 U.S.Code Cong. & Ad.News 2192, 2193. Among the "Congressional findings and declaration of policy" at the beginning of the Act is section 2(c), 43 U.S.C. § 1601(c), the section from which the obligation allegedly owing to the appellants stems. Section 2(c) reads in its entirety:

(c) no provision of this chapter shall replace or diminish any right, privilege, or obligation of Natives as citizens of the United States or of Alaska, or relieve, replace, or diminish any obligation of the United States or of the State of Alaska to protect and promote the rights or welfare of Natives as citizens of the United States or of Alaska; the Secretary is authorized and directed, together with other appropriate agencies of the United States Government, to make a study of all Federal programs primarily designed to benefit Native people and to report back to the Congress with his recommendations for the future management and operation of these programs within three years of December 18, 1971[.]

This action concerns the second half of this program, which authorizes and directs the Secretary to submit to Congress a study of "all Federal programs primarily designed to benefit Native people." The Secretary conducted the study and submitted the completed report to Congress on April 22, 1975. This study did not evaluate any programs primarily designed to benefit Natives not residing in Alaska; the Secretary admits he excluded any such programs from it.[2] On January 29, 1979, almost four years later, the appellants instituted this action asking the district court to order the Secretary to redo the study so that it would cover Alaska Natives who no longer reside in the state of Alaska.

---

1. The plaintiffs also sued on a breach of fiduciary duty theory in the district court, *see* Brief for Plaintiff-Appellants at App. 3 (complaint for mandamus), but do " 'not at this time press their claim that DOI's failure to make the study also violates its trust obligations.' " Plaintiffs' Reply Brief at 10.

2. The Secretary never denied that he excluded programs benefiting Natives not residing in Alaska from the study he made. *See* J.A. at 5 (Answer to Complaint). On appeal, the Secre-

tary changed his argument somewhat; he professed ignorance of the existence of any such programs, and challenged the plaintiffs to come up with even one. Brief for Appellee at 2–3. Appellants admitted in their reply brief that no such programs may exist, but correctly point out that if the purpose of the study was to find out if any did and what they were, by excluding such programs *ab initio*, the Secretary rendered himself incapable of fulfilling this statutory mandate. Plaintiffs' Reply Brief at 1–2.

The sole issue on this appeal is whether mandamus relief is available on the facts of this case.

*Analysis*

The federal district courts are granted the power to issue writs of mandamus by 28 U.S.C. § 1361. That section provides:

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to plaintiff.

The courts, because of the potential conflict between the branches of government engendered by use of this remedy, have limited its application to "only . . . the clearest and most compelling cases," *Cartier v. Secretary of State,* 506 F.2d 191, 199 (D.C.Cir. 1974), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), preferring to relegate mandamus to the status of an "extraordinary remedy." *Id.*

The courts have achieved this limitation in part through a narrow definition of the term "duty." According to traditional doctrine, a writ of mandamus will issue "only where the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." *United States ex rel. McLennan v. Wilbur,* 283 U.S. 414, 420, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931), *cited in National Treasury Employees Union v. Nixon,* 492 F.2d 587, 602 (D.C.Cir.1974).

■ The court has additional authority to refrain from issuing a writ, for the "exercise of the power of mandamus is a matter committed to the sound discretion of the trial court." *Cartier v. Secretary of State,* 506 F.2d 191, 199 (D.C.Cir.1974), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). The Supreme Court enunciated the principle that "mandamus is itself governed by equitable considerations and is to be granted only in the exercise of sound discretion." *Whitehorse v. Illinois Central R.R. Co.,* 349 U.S. 366, 75 S.Ct. 845, 99 L.Ed. 638 (1955). Thus, the case must be found

by a court to be clear and compelling on both legal and equitable grounds for a writ to issue.

The trial court found this case to be legally insufficient to justify issuance of a writ because the statutory directive was ambiguous. We disagree with this conclusion because we find that the statutory duty to include all programs primarily designed to benefit all Natives, regardless of residence, to be both clearly defined and peremptory.

■ The requirement that a duty be "clearly defined" to warrant issuance of a writ does not rule out mandamus actions in situations where the interpretation of the controlling statute is in doubt. The Supreme Court concluded that it would "greatly impair [ ] . . . the value of this writ" if "[e]very executive officer whose duty is plainly devolved upon him by statute might refuse to perform it, and when his refusal is brought before the court he might successfully plead that the performance of the duty involved the construction of a statute by him. . . ." *Roberts v. United States,* 176 U.S. 221, 231, 20 S.Ct. 376, 379, 44 L.Ed. 443 (1900). As long as the statute, once interpreted, creates a peremptory obligation for the officer to act, a mandamus action will lie. *See, e. g., Haneke v. Secretary of HEW,* 535 F.2d 1291, 1296 n.16 (D.C.Cir.1976); *National Treasury Employees Union v. Nixon,* 492 F.2d 587, 602 (D.C.Cir.1974); *Seaton v. Texas Co.,* 256 F.2d 718, 723 (D.C.Cir.1958).

Whether the statute at issue in this case created a ministerial duty subject to mandamus is a question of statutory interpretation. Plaintiffs-appellants argue that the statute is plain on its face. Section 2(c) of ANCSA "authorized and directed [the Secretary] . . . to make a study of all Federal programs primarily designed to benefit Native people." "Native" is defined in section 3(b), which begins: " 'Native' means a citizen of the United States who is a person of one-fourth degree or more Alaska Indian . . . ." The Secretary's obligation to make the study, appellants argue, is made manda-

tory by the use of the term "directed"; the obligation to include programs benefiting non-resident Natives is made mandatory by Congress' explicit inclusion in the statute of a definition of the term "Native" that is not limited to residents of Alaska. The Secretary has no authority, no discretion, to ignore that legislative directive when interpreting section 2(c). *Cf. Wilbur v. United States*, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809 (1930) (statute establishing benefit program for Indians contained no definition of "Indian," implying Secretary of Interior, charged with administering the program, had the power to do so).

The Secretary counters by arguing that the statute is not as clear as it seems. He makes three arguments, one based on the language of the section, another its context, and the third its legislative history.

The first argument is that the statute gives him the power to define the scope of the study because it gives him the power to decide which programs are *primarily designed to benefit* Natives. This argument is unpersuasive, though, because the fact that the statute allows him to exclude programs because they do not primarily benefit Natives does not give him the power to ignore the question of which programs primarily benefit non-resident Natives. His discretion under the statute is limited to deciding which programs sufficiently bene-

fit Natives so as to be included, and does not, as we have seen, include the power to define the term Native. All Natives, and all programs benefiting them, should have been considered when deciding which programs were primarily designed to benefit Natives.

His second argument is that the first sentence of section 2(c) limits the study to programs benefiting resident Alaska Natives because it states:

[N]o provision of this Act shall ... relieve, replace or diminish any obligation of the United States or of the State of Alaska to protect and promote the rights or welfare of Natives as citizens of the United States *or of Alaska*, ...

(Emphasis supplied). The appellee's brief does not explain how the disjunctive phrase *or of Alaska* indicates an intention to restrict the section's applicability to Alaska Natives, and frankly, we do not see how he could. If anything, the use of the disjunctive "or" rather than "and" indicates an intention to cover Natives who are citizens of the United States *or* Alaska. *See* note 5 *infra.*

Finally, the Secretary argues that the legislative history supports his reading of the statute to include only Alaska residents. He refers to debates in an earlier Congress on the predecessor bill[3] to that enacted as

**3.** The bill that was the subject of those debates was S. 1830, 91st Cong., 1st Sess. (1969). Section 2(c) of ANSCA can trace its roots to two sections of that bill, section 2(d) and section 4(b)(1). They are reproduced in full below. *Sec. 2(d).*

No provision of this Act shall be construed to replace, diminish or otherwise modify any right, privilege, or obligation of Alaska Natives as citizens of the United States and the State of Alaska, nor to relieve, replace, or diminish any obligation of the United States or the State to protect and promote the rights and welfare of Alaska Natives as citizens of the United States and the State of Alaska. The payments and grants authorized under this Act constitute compensation for the extinguishment of claims to land, and shall not be deemed a substitute for any governmental programs otherwise available to the Native people of Alaska as citizens of the United States and the State of Alaska, nor to effect a change or changes in the petroleum reserve

policy reflected in sections 7421 through 7438 of title 10 of the United States Code except as specifically provided in this Act. *Sec. 4(b)(1).*

The Secretary is authorized and directed, together with other appropriate agencies of the United States Government, promptly to initiate a study and to develop programs for the orderly transition of educational, health, welfare, and other responsibilities for the Alaska Native people from the United States to the State of Alaska. Within five years from the date of enactment of this Act, the United States shall cease to provide services to any citizen of Alaska solely on the basis of his racial or ethnic background: Provided, That nothing in this subsection shall affect services furnished the Natives through the Department of Health, Education, and Welfare, or diminish the applicability of the Act of April 16, 1934, as amended (48 Stat. 596), or the Acts of September 23, 1950, as amend-

ANCSA, which indicate only that one of Congress' purposes in enacting that bill was to transfer federal responsibilities for resident Natives to the State of Alaska. In fact, the debate from which that passage was taken includes a discussion of the plight of non-resident Natives, and the likely effects of the bill on them. *See* 116 Cong.Rec. 24223–8 (July 14, 1970).[4]

Moreover, the bill as enacted differed dramatically from the bill that was the subject of those debates,[5] and the appellees have not submitted any evidence to show that the expansion of the provision's language did not correspond to an expansion of its underlying purposes. In short, just because the section may have originated as a narrow provision directed towards a partic-

ular problem is no reason to ignore subsequent changes in language which expanded its scope.

■ In sum, we agree with the plaintiffs' interpretation of the statute as a peremptory command to the Secretary. The Secretary was directed to conduct a study of all programs primarily designed to benefit *all* Natives, resident in Alaska or not. Congress did not grant the Secretary the power to define "Native" for the purpose of that section; therefore, his duty of performance must be termed ministerial.

However, our finding that the Secretary's duties were sufficiently ministerial to be subject to mandamus does not necessarily lead us to conclude that this extraordinary remedy should be invoked.[6] In the words

ed (64 Stat. 967), and September 30, 1950, as amended (64 Stat. 1100). 116 Cong.Rec. 24407–08 (July 15, 1970).

4. The Secretary cited a passage from a discussion between Senators Harris and Stevens over the termination of services provision of section 4(b) of S. 1830, 91st Cong., 1st Sess. (1969), on page 13 of his brief, which indicates their concern over "whether, in fact, the State can assume the role of providing services for the Native people of Alaska ... after passage of this act." 116 Cong.Rec. 24224 (July 14, 1970). The Secretary cites this as evidence that the transition of responsibility for programs benefiting Natives from the federal to the state government was the sole purpose of section 4(b), the forerunner of section 2(c) of ANCSA. However, later in the same debate, this colloquy appeared:

Mr. HARRIS. May I just say this?
. . . .
That is, that American Indians, Eskimos, and Aleuts do not necessarily stay in their traditional areas.
. . . .
Under the present law, Mr. President, despite the fact that such a person does not continue to live in the traditional area, he is not thereby automatically cut off from the services he is entitled to as an American Indian, Eskimo, or Aleut, whereas, under this bill with this provision in it, the U.S. Government would cease to provide services to any citizen of Alaska solely on the basis of his racial or ethnic background.
What if he is in Oklahoma, working?
. . . .
Mr. STEVENS. Mr. President, I think the Senator from Oklahoma is making a contribution to the bill by raising this problem.
. . . .

What I am trying to work out is a compromise which says that any service that is needed which is not provided by the State or by the village itself or by an Alaskan Native corporation ... those services would continue to be provided by the Federal Government on an ethnic or racial background. But if the services are provided by the State or by a corporation or by the village, they would cease.
116 Cong.Rec. 24227–8 (July 14, 1970). Clearly, even at this stage the Senators were interested in programs that benefited Natives residing outside of Alaska, and the interplay between these programs and those directed solely towards Natives residing in Alaska.

5. In addition to being compressed into one provision, sections 2(d) and 4(b)(1) of S. 1830, 91st Cong., 1st Sess. (1969), were made much less specific during their evolution into section 2(c) of ANCSA. One notable change took place in what became the first sentence of 2(c), the very sentence relied on by the Secretary in his brief as evidence of an intent to exclude Natives not residing in Alaska from the provision—"Alaska Natives as citizens of the United States *and* the State of Alaska" (emphasis supplied) became "Natives as citizens of the United States *or* of Alaska" (emphasis supplied). That modification seems clearly designed to expand the provision's coverage to Natives not residing in Alaska, though there is no specific discussion to that effect.

6. The Secretary also argues in his brief that mandamus is unavailable because the duty created by section 2(c) is owed to Congress, not the appellants in this case. Therefore, he maintains, the plaintiffs have no standing to bring this action. Brief for the Appellee at 14–16.

of Justice Brandeis, "[a]lthough classed as a legal remedy, its [a writ of mandamus'] issuance is largely controlled by equitable principles." *Duncan Townsite Co. v. Lane*, 245 U.S. 308, 38 S.Ct. 99, 62 L.Ed. 309, 312 (1917). As any remedy governed by equitable principles, mandamus must be sought with "reasonable promptness." *United States v. Olds*, 426 F.2d 562, 566 (3d Cir. 1970).

In our view, an unexplained delay of four years precludes us from finding that this petition was pursued with "reasonable promptness." This is especially true in light of the temporal nature of the data to have been collected. An itemization of federal programs that may or may not have existed five years ago is likely to be of little use today.

The very fact that the plaintiffs did not consider the study sufficiently important to file this lawsuit or take any other action with regard to the study until four years after its issuance, seven years after its authorization, indicates that this is not a "compelling" case worthy of the invocation of an extraordinary remedy. We therefore affirm the district court's denial of this writ.

*Petition denied.*

Appellants respond that, as the intended beneficiaries of any legislative action undertaken pursuant to the study, they have a legal interest in ensuring that it is carried out properly. Plaintiffs' Reply Brief at 8. We express no opinion on the merits of this issue, for we are convinced that the petition must be denied because of the appellants' failure to pursue this remedy in a timely fashion.