**GRACE LINE, Inc., et al., Plaintiffs,**

v.

**PANAMA CANAL COMPANY, Defendant.**

Civ. 103–229.

United States District Court
S. D. New York.

June 28, 1956.

Maclay, Morgan & Williams, New York City, for plaintiffs. C. Dickerman Williams, Bernard Schwartz, New York City, J. Stewart Harrison, San Francisco, Cal., William I. Stoddard, New York City, of counsel; Brobeck, Phleger & Harrison, Associate Counsel, San Francisco, Cal.

Warren E. Burger, Asst. Atty. Gen., for defendant. Leavenworth Colby, Chief, Admiralty and Shipping Section, Department of Justice, E. Robert Seaver, Atty. in Charge, N. Y. Office, Admiralty and Shipping Section, Department of Justice. Benjamin H. Berman, George Jaffin, Attys., Department of Justice, Washington, D. C., of counsel.

WALSH, District Judge.

This is an action by a group of steamship lines to compel defendant to prescribe new tolls for the Panama Canal and for damages based upon its collection of allegedly excessive tolls. Defendant moves to dismiss the complaint, claiming that the court has no jurisdiction over the subject matter because (1) the prescription of new tolls is discretionary; (2) plaintiffs have no standing to sue; and (3) defendant's action is subject to the approval of the President.

The statute in question is Sections 411 and 412, Tit. 2, of the Canal Zone Code [1] which reads:

" '411. Authority To Prescribe Measurement Rules and Tolls.—The Panama Canal Company is authorized to prescribe and from time to time change (1) the rules for the measurement of vessels for the Panama Canal, and (2), subject to the provisions of the section next following, the tolls that shall be levied for the use of the Panama Canal: *Provided, however,* That the rules of measurement, and the rates of tolls, prevailing on the effective date of this amended section shall continue in effect until changed as provided in this section: *Provided further,* That the said corporation shall give six months' notice, by publication in the Federal Register, of any and all proposed changes in basic rules of measurement and of any and all proposed changes in rates of tolls, during which period a public hearing shall be conducted: *And provided further,* That changes in basic rules of measurement and changes in rates of tolls shall be subject to, and shall take effect upon, the approval of the President of the United States,

[1.] Act of September 26, 1950, C. 1049, 64 Stat. 1038, 1042, which amended 48 Stat. 1122, Act of June 19, 1934.

whose action in such matter shall be final and conclusive.' "

" '412. Bases of Tolls.— * * *

" '(b) Tolls shall be prescribed at a rate or rates calculated to cover, as nearly as practicable, all costs of maintaining and operating the Panama Canal, together with the facilities and appurtenances related thereto, including interest and depreciation, and an appropriate share of the net costs of operation of the agency known as the Canal Zone Government. * * * ' "

It is incidental to the authorization for the transfer of the Canal to the defendant by the President and took effect upon the execution of that transfer on July 1, 1951.[2] Until then the Canal had been administered as an independent agency, under the Secretary of War and the Secretary of the Army.

Defendant is a government corporation, reorganized in 1948 to conform with the Government Corporation Control Act.[3] Its predecessor, the Panama Railroad Company, had been a New York corporation, organized in 1849 for the purpose of constructing a railroad across the Isthmus. The United States had acquired all of its stock from the French stockholders who had previously attempted to dig the Canal. Until 1950, defendant operated facilities incidental to the Canal, such as a railroad, steamship line, dry docks and hotels, but it did not operate the Canal itself.

The United States, as owner of the defendant, is represented by the President or such other officer of the United States as he may designate. The President or the designated officer is known as the stockholder. The Board of Directors is appointed by and holds office at his pleasure, except that the Governor of the Panama Canal Zone[4] must be a director and president of the corporation.[5]

The transfer of the Canal was in furtherance of a plan to make the commercial facilities of the Canal self-supporting.[6] It was authorized upon a recommendation of the Bureau of the Budget to separate the facilities for the service of commerce from those required for national defense and the police functions of the Canal Zone Government, and to get the former under the businesslike accounting and budget control which a government corporation is permitted to use rather than those required of government departments.[7] It was precipitated by the belief that an increase in Canal tolls was necessary, and one had actually been proclaimed by the President although it was deferred pending consideration of the legislation.[8] It was hoped that the statute would establish a permanent tolls policy which would permit periodic adjustment of tolls, to keep the commercial

---

2. Exec. Order No. 10263, 16 Fed.Reg. 6333 (1951), U.S.Code Cong. and Adm.Service 1951, p. 1050.

3. 31 U.S.C.A. § 869(b). The Act reincorporating defendant is Act of June 29, 1948, C. 706, 62 Stat. 1075, Canal Zone Code, §§ 2–245 to 2–256.

4. The President is authorized to govern the Canal Zone or cause it to be governed by a Governor whom he appoints by and with the advice and consent of the Senate for a four year term. Canal Zone Code, Tit. 2, §§ 5, 6.

5. 62 Stat. 1077 (1948).

6. Bureau of the Budget Report, H.Misc. Doc. 460, 81st Cong., 2d Sess., 13–16 (1950); S.Rep. No. 2531, 81st Cong., 2d Sess. 4 (1950).

7. Ibid.

8. Proclamation No. 2775, March 26, 1948, 62 Stat. 1494. The effective date was deferred by Proclamation No. 2808, Sept. 7, 1948, 62 Stat. 1553, Nos. 2831, March 12, 1949, 63 Stat. 1266, and 2852, Aug. 25, 1949, 63 Stat. 1291, No. 2875, March 6, 1950, 64 Stat. A392, and the original Proclamation was revoked by Proclamation No. 2903, Sept. 26, 1950, 64 Stat. A433, when the new statute was enacted. Prior to the 1950 amendment, the President had power to change the rate of tolls between fixed limits at any time upon six months' notice. Canal Zone Code of 1934, Tit. 2, § 411.

542

facilities of the Canal self-supporting and make it most useful to commerce.[9]

There is no question but that new tolls, if they are prescribed, must conform with Section 412. The first question is whether the statute which "authorized" the fixing of flexible toll rates in accordance with this section, mandated a change to toll rates so computed, or whether it left to the discretion of the defendant, the continuation of the prevailing rates for an indefinite period of time. Plaintiffs claim that Section 411 mandates the prescription of new tolls in accordance with the formula contained in Section 412; that plaintiffs, as users of the Canal, have a right to transit at these prescribed tolls; that execution of the formula of Section 412 would result in a reduction in toll rates; and that the continuation of the previous tolls constitutes an unlawful exaction for the exercise of this right. It is assumed for the purpose of this motion that tolls prescribed pursuant to Section 412 would be lower than those now prevailing, but defendant contends that under such circumstances it was left with the discretion to keep the prevailing toll rates in effect.

It is my conclusion that the statute did not compel prescription of tolls under the statutory formula as long as defendant was content with the then prevailing tolls. It fixed no time within which the new tolls were required to be prescribed. It expressly provides for the continuation of the prevailing tolls until changed by the defendant. Its language giving power to prescribe new tolls under the statute is permissive in form; it "authorizes" the prescription of new tolls.[10] When the present provision is read against the pre-existing one, it is apparent that the language "is authorized to prescribe and from time to time change" is identical with the language formerly authorizing the fixing of tolls by the President, whose power was indisputably discretionary.[11] The discriminating use of the permissive form in Section 411 and the mandatory form "shall" in Section 412 manifests an intent to make this language permissive.[12] In addition, grammatically, the phrase subjecting tolls to the statutory formula, "subject to the provisions of the section next following", modifies the words "prescribe" and "change" not "authorize". Consequently, it is a limit on the extent

9. The House Report speaks of a "definite and permanent Panama Canal tolls policy" and the need for legislation "establishing tolls policy". H.Rep. 2935, 81st Cong., 2d Sess., 4, 6 (1950). The Report of the Bureau of the Budget states: "While the tolls rate should not be changed on a year-to-year basis since 1 year's experience is insufficient to reflect accurately long-range trends, the rate should be adjusted periodically as changes take place in the factors that determine the charges that should be made for the use of the Canal. As the 1937 special committee expressed it: "'Economic and commercial conditions are not static. The Panama Canal is a facility for the service of interoceanic commerce. The charges for the service should receive such adjustments from time to time as will keep the charges in harmony with the needs of the Canal and the requirements that must be met in making the Canal the servant and assistant of international intercourse.'" (H.Misc.Doc. No. 460, 81st Cong., 2d Sess., 16, (1950)).

10. See United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 418, 420, 51 S.Ct. 502, 504, 75 L.Ed. 1148: "* * * The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable." See also United States ex rel. Simons v. Hines, 63 App.D.C. 55, 69 F.2d 229. Cf. Red Canyon Sheep Co. v. Ickes, 69 App.D.C. 27, 98 F.2d 308, 313–314.

11. The former language of Section 411 provided: "The President is authorized, subject to the provisions of the section next following, to prescribe and from time to time change the tolls that shall be levied by the Government of the United States for the use of the Panama Canal, but no tolls when prescribed as above shall be changed unless six months' notice thereof is given by the President by proclamation." Canal Zone Code of 1934, Tit. 2, § 411.

12. United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 51 S.Ct. 502; United States ex rel. Zapp v. District Director of Immigration, 2 Cir., 120 F.2d 762, 764–765.

of change, not the decision whether to change or not. The essential language is as follows:

'The Panama Canal Company is authorized to prescribe and from time to time change \* \* \*, subject to the provisions of the section next following, the tolls that shall be levied for the use of the Panama Canal \* \* \*".

In amending the section Congress did not leave that phrase in its original position immediately following the word "authorize" but moved it away from that word to a position after the words "prescribe" and "change".[13] Such a transposition was quite evidently a precaution against the very ambiguity which plaintiffs are now trying to read into the statute.[14]

The legislative history is consistent with this construction of the statute's language. Congress in all probability expected that the new formula would be resorted to as soon as defendant could conveniently make the required studies and computations because it had been informed that the new formula would produce more revenue than the prevailing toll rates. Congress did not, however, suggest or consider *compelling* defendant to depart from the then prevailing tolls. It assumed defendant would do so voluntarily. The expectation that tolls would be increased is spread through the reports of the Congressional Committees and their hearings.[15] The estimate submitted to Congress by the Bureau of the Budget was that a five cent per ton increase would be required by the statutory formula,[16] and Congressional discussions centered primarily on proposed restrictions to prevent it from going substantially higher.[17]

13. The section formerly read: "The President is authorized, subject to the provisions of the section next following, to prescribe and from time to time change \* \* \*".

14. The change in the modifying position of the "subject to" clause was not necessary to enable Congress to subject tolls to section 412 without subjecting rules for the measurement of vessels. By an easy rearrangement of the words of the former provision it could have provided: "The \* \* \* Company is authorized to prescribe and from time to time change the rules for the measurement of vessels, and, subject to the provisions of the section next following, it is authorized to prescribe and from time to time change the tolls. \* \* \*".

15. See for example Statements of Former Senator Joseph Ball, representing the Association of American Ship Owners; Colloquy during Statement of Gregory Prince, representing the Association of American Railroads; Hearings before the Subcommittee on the Panama Canal of the Committee on Merchant Marine and Fisheries, House of Representatives on H.R. 8677, 81st Cong., 2d Sess., 80, 141 (1950); Statement of Harold Seidman, accompanied by Russell Roane, representing the Bureau of the Budget; Colloquy during statement of Joseph Ball, Vice President, Association of American Ship Owners; Hearing before a Subcommittee of the Committee on Armed Services, United States Senate on H.R. 8677, 81st Cong., 2d Sess., 8, 17–18 (1950).

16. The report of the Senate Committee on Armed Services states that:
"\* \* \* The committee inquired into the effect of this legislation on the existing tolls which are now set at 90 cents a vessel-ton, as well as the amount of interest that would be paid into the Treasury under the new bill. \* \* \*.
"Testimony of the representatives of the Bureau of the Budget indicated that under prevailing conditions the application of the provisions of this bill, as amended, would probably result in a tolls rate of about 95 cents per net vessel-ton. This is derived from the following data: \* \* \*". (S.Rep. No. 2531, 81st Cong., 2d Sess., 5 (1950) ).

17. The principal controversies concerned a proposal for a $1 maximum limit which was defeated, [Hearing before a Subcommittee of the Committee on Armed Services, United States Senate on H.R. 8677, 81st Cong., 2d Sess., 5, 9, 10, 16, 27–28 (1950); Hearings before the Subcommittee on the Panama Canal of the Committee on Merchant Marine and Fisheries, House of Representatives on H.R. 8677, 81st Cong., 2d Sess., 80 (1950)] and the proposal to eliminate interest during construction from the capital cost of the Canal which was accepted and which it was believed would result in only a five cent per ton increase

Although on one occasion a spokesman of the Bureau of the Budget spoke of the bill as providing that the Company "shall prescribe" toll rates in accordance with the statutory formula,[18] equally important statements regarding the language of Section 411 speak of it in a permissive sense.[18a] The principal spokesman for the steamship lines described it as a transfer of the President's authority rather than a contraction of it.[19] Further, although the House Report speaks of the statute as "establishing tolls policy",[20] there was express recognition in the hearings and in the debate that defendant might delay the imposition of new tolls and that Congress could control such action or non-action upon review of its budget.[20a]

instead of fifteen cents per ton. [Hearings before the Subcommittee on the Panama Canal of the Committee on Merchant Marine and Fisheries, House of Representatives on H.R. 8677, 81st Cong., 2d Sess., 51, 52–3, 56, 78 (1950); Hearing before a Subcommittee of the Committee on Armed Services, United States Senate on H.R. 8677, 81st Cong., 2d Sess., 8 (1950).]

18. Statement of Harold Seidman before a Subcommittee of the Committee on Armed Services, United States Senate, op. cit. 7: "H.R. 8677 provides that the Panama Canal Company shall prescribe the toll rates in accordance with a formula established in section 14 of the bill, subject to the President's approval. The Company, as under present law, would be required to give 6 months' prior notice of any proposed changes in rates, and, in addition, to conduct a public hearing on the proposed changes."

In several instances persons appearing before the Senate Committee referred to the new tolls as being "required". In each instance the witness was describing the effect of Section 412 not 411. He was stating, in substance, that Section 412 "required" prescription of tolls at a particular rate. (Hearings before a Subcommittee of the Committee on Armed Services, United States Senate on H.R. 8677, 81st Cong., 2d Sess., 8, 10, 12, 26 (1950).) There is no question that if tolls are to be prescribed they are required to conform to section 412. The question is whether section 411 requires that they be prescribed.

18a. Statement of Hon. Francis R. Newcomer, Governor of the Canal Zone, and President of the Panama Railway Co., Hearings before the Subcommittee on the Panama Canal of the Committee on Merchant Marine and Fisheries, House of Representatives on H.R. 8677, 81st Cong., 2d Sess., 30 (1950): "14. Sections 24 and 25 of the bill would amend the existing tolls sections (secs. 411 and 412, respectively, of title 2, Canal Zone Code) in such manner as to vest in the corporation the authority to fix measurement rules and tolls, and to prescribe the bases of tolls. * * *"

The Report of the House Committee on Merchant Marine and Fisheries stated: "The Directors of the Company will be authorized by this bill, to establish toll rates subject to the President's approval. Such rates will be finally set only after notice and public hearing. * * *" (H.Rep. No. 2935, 81st Cong., 2d Sess., 3 (1950).)

19. Statement of Former Senator Joseph Ball, representing the Association of American Ship Owners, Hearings before the Subcommittee on the Panama Canal of the Committee on Merchant Marine and Fisheries, House of Representatives on H.R. 8677, 81st Cong., 2d Sess., 76 (1950): "We have no objection to section 24, which transfers the authority to fix tolls and basic rules of measurement to the Panama Canal Company, subject to final approval by the President. The transfer of authority retains the present provision in the law requiring six months' notice, by publication in the Federal Register, of any proposed change in toll rates or measurement rules."

The President had complete discretion as to when to change tolls under the former statute.

20. H.Rep. 2935, 81st Cong., 2d Sess., 4, 6 (1950).

20a. Statement of Harold Seidman, Bureau of the Budget, House Hearings on H.R. 8677, at pp. 49–50: "Mr. Shelley. On page 5 in the last sentence of the second paragraph you say: 'The Congress will, of course, have an opportunity to examine the tolls policy in connection with its review of the business type budget to be submitted annually by the company.'

"Can you elucidate on that a little more; it is more of a possible review of it?

"Mr. Seidman. No; it is a going review. That, we believe, is one of the advantages of the new arrangement—that

It is also noteworthy that Congress permitted a bill to die which would have expressly required the Governor of the Canal to report proposed rates under a similar new formula within sixty days,[21] and that it failed to act upon the request of a representative of the steamship lines that a Congressional Committee be designated a "watchdog" to receive at regular intervals suggestions by the steamship industry as to the execution of the Act.[22]

■■ At the heart of any consideration of the nature of the duty imposed upon the defendant, as well as the other questions raised by this motion, is the power entrusted by Congress to the President with respect to the Canal in general and its tolls in particular. Section 411, itself, gives the President unrestricted power to block any change in tolls. And his unrestricted control over the appointment and removal of defendant's directors, gave him full power to compel them to perform any duty with respect to the prescription of toll rates to which the statute might subject them.[23] No objection was expressed to the continuation

the Panama Canal Company will come in with a business type budget which is more informative and will pertain to a business operation more than the present budget. It is not merely a question of a request for appropriations; or how much they spent last year. It is an excellent statement of financial condition—income and expense, capital expenditures, as distinguished from operating expenses, and so forth.

"Congress, in going over that, would be able to determine—are the rates high enough to cover the cost of operation? That would be indicated in the budget statement which would be practically a balance sheet, or, on the other hand, you might say, 'Your revenues are far exceeding your cost of operation and you should consider changing your policy with respect to rates.'

"Also, of course, the Congress may act upon how much should be paid in dividends by the corporation.

"Mr. Shelley. It is in the review by Congress we are to determine the budget submitted, which will be in advance of the levying of the tolls.

"Mr. Seidman. That is right. You would not change the rates from year to year in any event. I think over a period of years, seeing what the income statement was and the expense statement, you could determine from that whether the tolls were too high or too low, or what the reasons were for the toll policy. *There may be many reasons why the Congress might have the Canal operate at a loss for a certain period, or at a profit, depending upon the circumstances.*" (Emphasis supplied.)

Statement in debate by Representative O'Toole, 96 Cong.Rec. 13372 (1950): "* * * The bill, if enacted, will permit a board of directors to know the sources and amounts of revenue in the Canal enterprise. It will, under well-established corporate control methods, give the Congress a thorough and complete accounting for these business functions on an annual basis, and will present annually to the Congress a budget reflecting all the revenues and expenses of these many business enterprises. While the Board of Directors of the proposed Panama Canal Company will have normal powers, matters of policy will be controlled by the Congress through the annual budget submitted to the Congress under the Government Corporation Control Act of 1945".

21. S. 3650, 81st Cong., 2d Sess., Senator Magnuson; the last bill section reads: "Sec. 2. The Governor of the Canal shall report to the President and to the Congress not later than sixty days after the date of enactment of this Act, a schedule of proposed toll rates, computed in compliance with the amendment made by this Act, including the detailed factors used in determining such rates."

22. Statement of Frazer A. Bailey, President of the National Federation of American Shipping, Inc., Hearings before the Subcommittee on the Panama Canal of the Committee on Merchant Marine and Fisheries, House of Representatives, on H.R. 8677, 81st Cong., 2d Sess., 61–62 (1950): "Following the precedent in the case of the administration of the ECA Act, we suggest that this Committee constitute itself into a 'watchdog committee', that the Canal authorities be required to submit reports at regular intervals, and that the industry be permitted to present its suggestions in the interest of effectively carrying out the provisions on H.R. 8677 and of congressional intent."

23. The only restriction upon the President's selection of the defendant's stockholder is that he be a public officer. The designation is at the pleasure of

of his control.[24] Indeed, it was pointed to as one of the bill's two important safeguards, the other being Congressional control of the defendant's budget.[25] The interposition of the defendant in the toll making procedure was as an aid to the President, not as a restriction upon him. It was to delegate the "almost ministerial" aspects of this work to an agency with an adequate staff for this work.[26] It was intended that after defendant prescribed tolls on the basis of the factors which determine how high a toll must be to cover the cost of service, the broader questions of the needs of the national transportation policy and foreign policy would be left as an unlimited delegation to the President.[27] Defendant is no more than a corporate subordinate of the President and the act here in question is subject to the control of and nullification by the President. Under such circumstances

the President in the absence of any provision to the contrary. Myers v. U. S., 272 U.S. 52, 161, 47 S.Ct. 21, 71 L.Ed. 160; Bailey v. Richardson, 86 U.S.App. D.C. 248, 182 F.2d 46, 58, affirmed 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352; Board of Directors of City Trusts v. Maloney, 78 U.S.App.D.C. 371, 141 F. 2d 275, certiorari denied 323 U.S. 714, 65 S.Ct. 40, 89 L.Ed. 574.

The appointment of members of defendant's board is not subject to the advice and consent of the Senate. Members serve at the pleasure of the stockholder.

24. The President was not even mandated to transfer the Canal to defendant; under the statute he could have continued to operate the Canal as an independent agency with his old power with respect to tolls. 64 Stat. 1042 (1950).

25. Statement of Harold Seidman, Bureau of the Budget, Hearings before a Subcommittee of the Committee on Armed Services, United States Senate on H.R. 8677, 81st Cong., 2d Sess., 7 (1950): "There are two important safeguards provided in the bill. The first is the requirement for a public hearing and the second for Presidential approval. Since tolls may have an effect on national transportation policy, review and approval of the rate by the President is believed essential. The Congress will, of course, have an opportunity to examine tolls policy in connection with its review of the business-type budget to be submitted annually by the Company."

26. The Bureau of the Budget stated in its report:

"At the policy level the programs of the Panama Canal and the Panama Railroad Company have their most significant impact in the transportation area. Actions taken by the Canal may vitally affect not only world trade and shipping but also intercoastal trade and transcontinental railroads. The question of toll rates, for example, raises important issues which should be reviewed in the light of the objectives of national transportation policy. Neither the Secretary of Defense nor the Secretary of the Army has at the present the departmental responsibility or the staff resources to deal adequately with policy issues of this character. Military-staff channels are not and should not be used for this purpose. In the absence of other staff facilities, the Secretary of the Army has been compelled to rely almost exclusively on his administrative assistant, who has numerous other important duties, and the Washington Office of the Panama Canal for assistance on Panama Canal matters.

"Establishment of a special Panama Canal staff in either the Office of the Secretary of Defense or the Secretary of the Army would offer only a partial solution to the problem and might well further complicate coordination of transportation policy. * * *"

[The Bureau's recommendation for a complete solution, that this function be given the Secretary of Commerce, was not followed.]

In support of its recommendation that the President be relieved of the work of applying the statutory formula it said: "Provided that there is agreement as to the formula for establishing the tolls rates and adequate business-type accounts and financial reporting, the actual setting of the tolls rate becomes almost a ministerial function which could well be delegated to the corporation's board of directors. However, since the tolls rate may have an effect on national transportation policy, review and approval of the rate by the President is essential." (H.Misc.Doc. No. 460, 81st Cong., 2d Sess., 11, 16 (1950).)

27. See footnotes 25 and 26, supra.

The State Department was concerned that there be no violation of the Treaty of 1901 with Great Britain. (Hearings before the Subcommittee on the Panama Canal of the Committee on Merchant Marine and Fisheries, House of Representatives on H.R. 8677, 81st Cong., 2d Sess., 43, 85–86 (1950).)

the courts will not construe it as ministerial. Marbury v. Madison, 1 Cranch 137, 170, 5 U.S. 137, 170, 2 L.Ed. 60;[28] see also United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 418, 420, 51 S.Ct. 502, 75 L.Ed. 1148.

■■ The courts will, by mandamus, compel an officer to exercise discretion when he has failed to do so because of a misconception of law, McGrath v. Kristensen, 340 U.S. 162, 71 S.Ct. 224, 95 L. Ed. 173; Gutnayer v. McGranery, D.C. D.C., 108 F.Supp. 290, modified and affirmed sub. nom. Brownell v. Gutnayer, 94 U.S.App.D.C. 90, 212 F.2d 462; or because of disregard of the statutory standards for the exercise of his discretion, United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268, 74 S.Ct. 499, 98 L.Ed. 681. But mandamus cannot be had to compel the exercise of judgment or discretion in a particular way or to direct the retraction or reversal of action already taken in the exercise of judgment or discretion. I. C. C. v. United States ex rel. Members of Waste Merchants Ass'n of N. Y., 260 U.S. 32, 34, 43 S.Ct. 6, 67 L.Ed. 112; Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 218, 50 S.Ct. 320, 74 L.Ed. 809. Unless plaintiffs merely seek to have defendant formalize its views on tolls, a step not required by the statute, there could be no possible use of mandamus here except to compel the defendant to act in a particular way, to compel it to prescribe tolls upon a formula it has in its discretion declined to use. Mandamus will not lie to direct discretion in this manner. United States ex rel. Roughton v. Ickes, 69 App.D.C.

324, 101 F.2d 248, 253. Here the discretion given defendant as to whether to change to the new formula is so unrestricted that even if its action could be regarded as final rather than advisory to the President, there could be no legislative standard applicable as a basis for court interference as long as defendant earns enough revenue to carry out the Canal functions contemplated by the statute.[29] Accordingly the complaint must be dismissed for lack of jurisdiction over the subject matter.

Even though defendant's duty were held to be mandatory rather than permissive it would be necessary to dismiss the complaint because (1) the action of defendant, being subject to nullification by the President, lacks finality and (2) plaintiffs lack standing to sue.

■ Even when an administrative agency is independent of the President, its duty to act mandatory, and its determination otherwise reviewable, if its determination is subject to Presidential nullification the court will not review it. Such a determination lacks finality in the sense that the action of the court will not determine any right of the parties. The court cannot control whether the determination of the agency, once given, is heeded or disregarded by the President. Such an administrative order has been held merely advisory and not reviewable, either as to the correctness of the advice or for errors of law. Chicago & Southern Airlines, Inc., v. Waterman S.S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568; Trans World Airlines v. Civil Aeronau-

28. "* * * Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct would be rejected without hesitation. But where he is directed by law to do a certain act, affecting the absolute rights of individuals, *in the performance of which he is not placed under the particular direction of the president, and the performance of which the president cannot lawfully forbid*, and therefore, is never presumed to have forbidden; as, for example, to record a commission or a patent for land, which has received all the legal solemnities; or to give a copy of such record; in such cases, it is not perceived, on what ground the courts of the country are further excused from the duty of giving judgment that right be done to an injured individual, than if the same services were to be performed by a person not the head of a department." 1 Cranch at page 170. (Emphasis supplied.)

29. Cf. Supervisors v. United States, 4 Wall. 435, 18 L.Ed. 419.

tics Board, 2 Cir., 184 F.2d 66; Pan American Airways Co. v. Civil Aeronautics Board, 2 Cir., 121 F.2d 810; Employers Group of Motor Freight Carriers v. National War Labor Board, 79 U.S.App. D.C. 105, 143 F.2d 145, 151, certiorari denied 323 U.S. 735, 65 S.Ct. 72, 89 L.Ed. 589.[30]

Plaintiffs attempt to distinguish the Civil Aeronautics Act cases because the statute involved, Section 801, 49 U.S. C.A. § 601, expressly required the President's approval of Board action when an application was denied as well as when it was granted.[31] They claim that here the President has only a veto power and that accordingly action by the defendant was final, unless a change in tolls was prescribed. Such a claim places too nice a reliance upon the independence of the defendant's directors from the sole stockholder at whose pleasure they serve. The President, directly as stockholder or through his designee, had ample power to compel defendant to prescribe new toll rates for his consideration if he wanted it to do so. If the President, himself, were defendant's stockholder, he could not obtain mandamus without first exercising his powers as stockholder. The fact that these powers are held by a designee is not significant; the designee also serves at the President's pleasure.[31a] The corporate policy in issue is of major importance. Removal for difference of view on such a matter would not be such a clumsy means of controlling defendant's action as to be ineffective, particularly in the light of Congress' express reliance on the President's approval of any change. Certainly need for interference by the courts is not great enough to require departure from the position the courts have so persistently and emphatically stated, that they will not act when their action may be nullified by the executive before it can affect the rights of the parties before it.[32]

Even if it could be said that defendant's duty to prescribe rates is mandatory, plaintiffs lack standing to sue. To have standing, they must allege a violation of a recognized legal right.[32a] The complaint alleges that defendant has com-

---

30. McGrath v. Kristensen, supra, 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173, must, of course, be distinguished. In that case the court compelled the Attorney General to exercise his judgment as to whether an alien was worthy of relief by Congress from deportation even though Congress might ultimately disregard his recommendation. In that case, however, the Attorney General's action was not without effect pending action by Congress. It carried finality as to a stay of deportation up to six months and on this basis the court distinguished Chicago & Southern Airlines v. Waterman S.S. Corp., supra, 340 U.S. at page 168, 71 S.Ct. at page 228. There also Congress had no easily effective means of compelling the Attorney General to advise it.

31. For a comparable implication of power of the President with respect to nonaction see Trans World Air Lines v. Civil Aeronautics Board, supra, 2 Cir., 184 F. 2d 66, at page 70-71.

31a. See footnote 23, supra.

32. See Chicago & Southern Airlines v. Waterman S.S. Corp., supra [333 U.S. 103, 68 S.Ct. 437]: " * * * It has also been the firm and unvarying practice of Constitutional Courts to render no judgments not binding and conclusive on the parties and none that are subject to later review or alteration by administrative action. * * * " 333 U.S. 113–114, 68 S.Ct. 437.

See Gordon v. United States, 117 U.S. 697, 702: "Congress [cannot] authorize or require this court to express an opinion on a case where its judicial power could not be exercised, and where its judgment would not be final and conclusive upon the rights of the parties and process of execution awarded to carry it into effect. * * * [The judgment] would be merely an opinion, which would remain a dead letter, and without any operation upon the rights of the parties, unless Congress should at some future time sanction it, and pass a law authorizing the court to carry its opinion into effect. Such is not the judicial power confided to this court. * * * ".

32a. Perkins v. Lukens Steel Co., 310 U.S. 113, 125, 60 S.Ct. 869, 84 L.Ed. 1108; Tennessee Electric Power Co. v. T. V. A., 306 U.S. 118, 137, 59 S.Ct. 366, 83 L. Ed. 543; Alabama Power Co. v. Ickes,

pelled plaintiffs to pay tolls at rates in excess of the standards provided by the 1950 statute, but there is no basis for their claim that they are entitled to transit the Canal at such tolls.

Plaintiffs argue that defendant is analogous to a public utility exacting an unreasonable charge and assume, without supporting authority, that a person has the same right to the use of the Canal as to the services of a common carrier.[33] Assuming, however, that plaintiffs have a right to use the Canal,[34] they were given no right to have tolls fixed in accordance with the formula of Section 412. In the absence of a statute there is no right by users to have tolls fixed at a particular rate.[34a] The statute contains no expression of such a private right. Nor is there any mention of such a right in its legislative history. Congress was concerned with the effect of toll rates upon the national transportation policy as well as with their sufficiency to cover the cost of Canal operation. Although the formula in Section 412 constitutes a complete legislative scheme for the computation of toll rates which will make certain facilities of the Canal self-supporting, no complete standards were enacted for the implementation of the national transportation policy or the preservation of the competitive balance between steamships and railroads. Because of the significance of Canal tolls in this respect, the President was given power to disapprove any prescribed change, even though it might conform exactly with the statutory formula.[34b] This power of the President was unrestricted and expressly final and conclusive. Under such circumstances, how can plaintiffs be said to have a right to transit the Canal at rates fixed pursuant to Section 412?

Neither was it Congress' apparent intent to give plaintiffs standing to compel the performance of defendant's advisory function for the President. Congress re-

---

302 U.S. 464, 479, 58 S.Ct. 300, 82 L. Ed. 374; Concurring opinion of Mr. Justice Frankfurter, Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 150–157, 71 S.Ct. 624, 95 L.Ed. 817.

33. No one questions that in the absence of a statute a shipper has a common law right to the service of a common carrier without unreasonable exactions. Cf. Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 436, 27 S.Ct. 350, 51 L.Ed. 553; Lewis-Simas-Jones Co. v. Southern Pac. Co., 283 U.S. 654, 51 S.Ct. 592, 75 L.Ed. 1333; Munn v. Illinois, 94 U.S. 113, 122, 24 L.Ed. 77. Nor is there any doubt that the defendant as a government corporation is liable for the commission of torts substantially to the same extent as a private corporation. Cf. Amy v. Supervisors, 11 Wall 136, 78 U.S. 136, 138, 20 L.Ed. 101. By statute defendant is expressly made subject to suit and actions against it have been upheld on previous occasions. Canal Zone Code Tit. 2, § 248, 62 Stat. 1078 (1948); Panama R. Co. v. Curran, 5 Cir., 256 F. 768, 771–772; Panama R. Co. v. Minnix, 5 Cir., 282 F. 47, 50; See also Bank of United States v. Planters' Bank of Georgia, 1924, 9 Wheat. 904, 907, 22 U.S. 904, 907, 6 L.Ed. 244.

34. The Canal Zone Code does not expressly give the right to anyone to use the Canal. Its use and operation are left to regulations by the President. Canal Zone Code, Tit. 2, § 9. These regulations also do not express a right to use the Canal by any person, but contain extensive and detailed restrictions as to its use. By treaty with Great Britain on November 18, 1901, it was agreed that: "1. The canal shall be free and open to the vessels of commerce and of war of all nations observing these Rules, on terms of entire equality, so that there shall be no discrimination against any such nation, or its citizens or subjects, in respect of the conditions or charges of traffic, or otherwise. Such conditions and charges of traffic shall be just and equitable. * * *" 32 Stat. 1903.

It is assumed that a person complying with the regulations of the President has a right to use the Canal.

34a. G. T. McGovern Trucking Co. v. Moses, Sup., 92 N.Y.S.2d 550, affirmed 277 App.Div. 758, 97 N.Y.S.2d 395; Lawless v. Duval County, D.C.S.D.Fla., 6 F.Supp. 303.

34b. See footnotes 25 and 26, supra.

lied upon the supervision of the President and its own control of defendant's budget to prevent arbitrary action by defendant.[35] In this regard, it is particularly significant that the statute lacks any provision for the initiation of a proceeding for a change in tolls upon complaint of a user, and that the decision not to change tolls need not be based upon any record or hearing. The only requirement for a hearing is *after* notice that a change in tolls has been proposed. Further, the hearing is not one to provide a basis for the determination of the rights of users, or one which will formulate a record upon which a court may review the compliance with the statutory standard. It is of the legislative type, in which an opportunity is given to the public to express its views, but which does not limit action to the views expressed.[36] In such a hearing a user of the Canal is given no different standing from any other person.

Defendant also contends that the action is necessarily one against the government. If it is only the President and not the defendant who could make effective the relief plaintiffs seek, the action would be one to be brought against the government and not against defendant. To the extent that plaintiffs' action is based upon the collection of excessive tolls, such is the case. The government never having consented to be sued, and the President being immune from suit,[37] the court could not grant this relief in a suit against the defendant. To the extent that the action merely seeks to compel the defendant to perform an alleged mandatory duty owed the public, it may be that the action is properly brought against the defendant, but as already explained, it must be dismissed upon other grounds.

Complaint dismissed.

---

35. See footnotes 20 and 25, supra.

36. See Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796; United States v. George S. Bush & Co., 310 U.S. 371, 60 S. Ct. 944, 84 L.Ed. 1259.

37. Mississippi v. Johnson, 4 Wall. (71 U.S.) 475, 499–501, 18 L.Ed. 437.